**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**GARY S. HIRSCHEY,**

                                        **Plaintiff,**

         **vs.**                                                      **05-CV-0466**

**MICHAEL J. ASTRUE*,**
**COMMISSIONER OF SOCIAL SECURITY,**

                                        **Defendant.**
_____

**APPEARANCES:**                                **OF COUNSEL:**

Conboy, McKay, Bachman & Kendall, LLP        Lawrence D. Hasseler, Esq.
407 Sherman Street
Watertown, New York 13601
_Attorney For Plaintiff_

Glenn T. Suddaby                                William H. Pease, Esq.
United States Attorney for
the Northern District of New York
P.O. Box 7198
100 South Clinton Street
Syracuse, New York 13261-7198
and
Office of General Counsel                        Barbara L. Spivak, Esq.
Social Security Administration                   Karen M. Ortiz, Esq.
26 Federal Plaza
New York, New York 10278
_Attorneys For Defendant_

         ** On February 12, 2007, Michael J. Astrue was sworn in as Commissioner of the Social
         Security Administration.  Pursuant to Federal Rule of Civil Procedure 25(d)(1), he is
         automatically substituted for former Commissioner Joanne B. Barnhart as the defendant in
         this action.

**NORMAN A. MORDUE, Chief U.S. District Judge:**

                        **MEMORANDUM-DECISION AND ORDER**

**I.       INTRODUCTION**

Plaintiff Gary Hirschey brings the above-captioned action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, seeking review of the Commissioner of Social Security's decision to deny his application for supplemental security income ("SSI") and disability insurance benefits ("DIB"). Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## II.    PROCEDURAL HISTORY

Plaintiff filed an application for SSI and DIB on September 20, 1995. (Administrative Transcript at p. 77, 124)[1]. The applications were denied on January 18, 1996. (T. 106, 129). After plaintiff's request for reconsideration was denied, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (T. 120, 134). The hearing was held on April 10, 1997. (T. 41). On September 24, 1997, ALJ Thomas P. Zolezzi issued a decision denying plaintiff's claim for supplemental security income and disability benefits. (T. 18-26). The Appeals Council denied plaintiff's request for review on July 19, 1999, making the ALJ's decision the final determination of the Commissioner. (T. 4).

On August 2, 1999, plaintiff filed a complaint in this Court seeking review of the Commissioner's decision. (Civil Action Number 99-CV-1195, Dkt. No. 1). On November 12, 1999, defendant filed an answer. (99-CV-1195, Dkt. No. 3). On February 7, 2000, the parties stipulated to remand the decision of the Secretary for a rehearing pursuant to 42 U.S.C. § 405(g). (T. 331). On April 1, 2000, the Appeals Council issued an Order vacating the prior decision and remanding the case to an ALJ for further proceedings. (T. 327). Specifically, the Appeals Council directed that the ALJ: (1) evaluate and weigh all physician evidence and opinion and

---

[1] Portions of the administrative transcript, Dkt. No. 7, will be cited herein as "(T__)."

information from other sources; (2) articulate further the severity and effect of the claimant's

mental impairment on his ability to function and perform a full range of work; and (3) evaluate

the issue of disability under the framework of the medical-vocational guidelines, obtaining

vocational expert testimony, as necessary. (T. 328-329).

On December 20, 2000, a hearing was held before ALJ John Lischak. (T. 451). The

hearing was adjourned until February 5, 2001 and continued with the testimony of a vocational

expert. (T. 520). On May 17, 2001, the ALJ issued a decision denying plaintiff's request for

benefits. (T. 306-318). The Appeals Council denied plaintiff's request for review on April 2,

2005, making the ALJ's decision the final determination of the Commissioner.[2] (T. 282). This

action followed.

### III.    FACTUAL BACKGROUND

Plaintiff was born on July 18, 1952 and was 48 years old at the time of the administrative

hearing on December 20, 2000. (T. 456). Plaintiff is married and has four children. (T. 457).

Plaintiff resides with his wife and one of his children in a two-story house. (T. 457). Plaintiff has

an 8th grade education and obtained his GED in 1983. (T. 458). In 1981, plaintiff became

certified in New York State as a nurse's aide/orderly. (T. 458).

From 1982 until 1986, plaintiff worked as a nurse's aide at Lewis County General

Hospital Nursing Home. (T. 50, 459). Plaintiff's responsibilities included caring for the personal

needs of the adult patients including lifting, changing, bathing and transporting the patients. (T.

144). From 1986 until 1989, plaintiff was employed as a nurse's aide at Lewis County ARC. (T.

---

[2] On July 19, 2001, plaintiff requested a review of the hearing decision by the Appellate Counsel. (T. 297).
The delay between plaintiff's request and the April 2, 2005 decision of the Appeals Council is not explained in the
record.

52).  Plaintiff's job duties included cooking, cleaning, passing out medications and "doing

behavioral management".  (T. 52-53).  Plaintiff was last employed from 1989 until 1995 as a

nurse's aide at Rome DDSO (Developmental Disabilities Service Office) working with mentally

handicapped adult patients. (T. 53).  Plaintiff's responsibilities at Rome DDSO were similar to

those in his prior jobs.  (T. 54, 142).

**A**.    **Plaintiff's Medical Treatment**

A review of the record reveals that plaintiff was treated for his alleged disabling

conditions by David Hoover, D.C., Abdul Latif, M.D., Andrew Bragdon, M.D., Tomy

Kuttentharappel, M.D., Jamal Emad, M.D., Nalin Sinha, M.D. and Timothy Wiebe, M.D.

Plaintiff was also treated at Lewis County General Hospital and Samaritan Medical Center.[3]

David Hoover, D.C.

On March 16, 1993, plaintiff had his first chiropractic treatment with David Hoover, D.C.

(T. 196).  On March 31, 1993, Dr. Hoover noted that an x-ray of plaintiff's lumbar spine was

negative and stated "there is off-venturing at L4 which may indicate a strained muscle". (T. 196).

From March 1993 until February 1995, plaintiff received chiropractic treatments from Dr.

Hoover. (T. 198-201).   During this time, Dr. Hoover occasionally "excused" plaintiff from work

and noted that he could return to work "as long as [his] spine is in alignment". (T. 199).  Dr.

Hoover also stated that plaintiff repeatedly re-injures his lumbar spine after lifting patients but

that this "occupational hazard" was "manageable". (T. 199).   During treatments, Dr. Hoover

concluded that plaintiff suffered from "acute lumbar spasming", "decreased spinal flexion", and

_____

[3] The record contains five notations by William S. Reed, M.D. (T. 180 - 185).  The notations contain Dr.
Reed's opinions on plaintiff's ability to return to work in 1992 and 1994.  (T. 180 - 185).  The record is devoid of
any treatment records or reports from Dr. Reed and further, does not indicate if Dr. Reed was specialized in any
area of medicine.

"spinal strains". (T. 198-201). On February 28, 1995, Dr. Hoover remarked that plaintiff had "spinal strains" and could return to work however, "it would be helpful if he had his entitled breaks". (T. 201).

On March 8, 1995, Dr. Hoover ordered a series of lumbar spine x-rays at Lewis County General Hospital due to plaintiff's complaints of pain in his lower back and right leg. (T. 205). The report noted an "unremarkable spine series" with "body heights and disc spaces" maintained. (T. 205).

On April 12, 1995, at the request of Dr. Hoover, plaintiff had an MRI taken of his lumbar spine at Rome Magnetic Associates. (T. 204). The MRI was performed to "rule out a disc herniation". (T. 204). The radiologist found "no evidence of disc herniation" with "mild discogenic type degenerative changes at L4-L5 and L5-S1" and "no indication of spinal stenosis". (T. 204).

On June 22, 1995, Dr. Hoover noted that plaintiff could and should return to work but that he was "prohibited by state doctor". (T. 202). Dr. Hoover stated that plaintiff was unable to stand for long periods but "[i]nactivity contra-indicated". (T. 202). On July 27, 1995, Dr. Hoover noted that "x-rays taken 4-12-95 misalignments at Lumbar L - 4,5 and L5-S1. Lumbar strain with mild discongenic changes and mild bulging at L - 4,5 and L5-S1 levels".[4] (T. 203). Dr. Hoover diagnosed plaintiff with lumbar sprain and subluxation to L3, L4 and L5. (T. 203).

On February 7, 1996, Dr. Hoover provided his opinion regarding plaintiff's condition to the Department of Social Services. Dr. Hoover opined that plaintiff had a "severe lumbar sprain with radiculopathy in his right leg and could not return to his regular job as a therapy aide". (T.

---

[4] Although Dr. Hoover refers to the April 12, 1995 films as "x-rays", the films taken on April 12, 1995 were MRI studies. (T. 204).

195).

On March 13, 1996, Dr. Hoover provided a functional analysis for the New York State Department of Social Services Office of Disability Determinations. (T. 186).  Dr. Hoover noted that plaintiff received 30 chiropractic treatments and diagnosed plaintiff with a lumbar sprain at L3, L4 and L5. (T. 186-187).  Dr. Hoover concluded that plaintiff's spinal flexion was impaired and spasming was present with spondylosis at L3,4,5.  Dr. Hoover noted that plaintiff could not resume his job as a therapy aide but could assume a non-physical job.  (T. 186).  Dr. Hoover stated that plaintiff took Tylenol for pain relief and did not need any ambulatory device. (T. 189). Dr. Hoover stated that plaintiff could not lift or carry; could stand or walk less than 2 hours per day; sit less than 6 hours per day; could engage in "limited" pulling but could not push objects. (T. 191).

On November 1, 1996, plaintiff was treated in the emergency room of Lewis County General Hospital complaining of low back pain after splitting wood.  (T. 264).  Upon examination, the attending physician noted that plaintiff had no radiation of pain, no tingling, no numbness or weakness. (T. 265).  The physician noted plaintiff had muscle spasm but no tenderness and straight leg raising was negative. (T. 265).  Plaintiff was diagnosed with a back strain and muscle spasm from overexertion and was given a prescription for Flexeril.[5] (T. 265).

On February 5, 1997, x-rays were taken of plaintiff's lumbar and cervical spine at Rome Memorial Hospital at the request of Dr. Hoover.  (T. 270 - 271).  The reports indicated muscular spasm and mild degeneration at the cervical level and "moderate intervertebral disc space narrowing at T12/L1". (T. 270-271).

_____

[5] Flexeril is a skeletal muscle relaxant for relief of muscle spasms. *Dorland's Illustrated Medical Dictionary*, 465, 725 (31st ed. 2007).

On October 20, 2000, Dr. Hoover completed a Medical Assessment of Ability to Do Work Related Activities (Physical) after examining plaintiff.  (T. 432-435).   Dr. Hoover opined that plaintiff could occasionally lift, but never carry, up to 10 pounds.  Dr. Hoover further stated that plaintiff could sit for 3 hours in an 8 hour day; stand and walk for 1 hour in an 8 hour day; never climb, stoop, crouch, kneel or crawl and occasionally balance. (T. 434).   According to Dr. Hoover, the "MRI 4/12/95 may have encroachment on thecal sac".  (T. 432).  Dr. Hoover referred to "radiographs" when asked to provide support for his assessments. (T. 435).

Daniel Root, M.D.

On June 25, 1993 and July 21, 1995, plaintiff was treated in the emergency room at Lewis County General Hospital. (T. 234).  On both occasions, plaintiff was treated by Dr. Root for a "seizure-like spells". (T. 234-241).  In July 1995, plaintiff was at the hospital for an elective EEG when he had a seizure.[6]  (T. 237).  Dr. Root noted that the EEG was "unremarkable" and diagnosed plaintiff with "atypical status epilepticus".[7] (T. 237).  Dr. Root advised plaintiff to follow with his doctor and suggested that he obtain a "neurological consult with Dr. Latiff [sic] and an MRI of his brain". (T. 239).

Abdul Latif, M.D.

On July 28, 1995, plaintiff was examined by Dr. Abdul Latif, a neurologist.  (T. 242). Plaintiff told Dr. Latif that he "was doing well" until June when he had a seizure and went to the

---

[6] An EEG is an electroencephalogram which is a recording of the potentials on the skull generated by currents emanating spontaneously from nerve cells in the brain.  *Dorland's* at 607.

[7] Atypical status epilepticus is a continuous series of seizures that does not include generalized tonic-clonic seizures.  The condition is serious but not life-threatening. *Id*. at 1793.

emergency room.  (T. 242).  Plaintiff advised Dr. Latif that he had been prescribed Dilantin and Phenobarbital. [8] (T. 242).   Dr. Latif noted that a CT of plaintiff's brain was normal. (T. 243).  Upon examination, Dr. Latif found that plaintiff was neurologically "within normal limits" except for positive Romberg testing.[9] (T. 243).  Dr. Latif diagnosed plaintiff with possible post traumatic seizures or pseudoseizures and prescribed Dilantin and Tegretol.[10] (T. 242-243).

On August 7, 1995, an MRI was taken of plaintiff's brain at Samaritan Medical Center at the request of Dr. Latif. (T. 246).  The report of the MRI indicated  "no intracranial abnormality is demonstrated". (T. 246).  On August 8, 1995, plaintiff returned to Dr. Latif and advised that "he had been doing well until two days ago" when he had "eight spells". (T. 245).  Dr. Latif noted that plaintiff's motor and sensory examination "remain unchanged". (T. 245).   Dr. Latif advised plaintiff to continue with his medications and referred plaintiff to "Syracuse for further evaluation of his seizures".   (T. 245).


Andrew Bragdon, M.D.

On September 26, 1995, plaintiff was admitted to University Hospital under the observation of Dr. Andrew Bragdon, a neurologist. (T. 247).   Dr. Bragdon noted that plaintiff complained of having 12 spells a day lasting from 15 seconds to 1 minute.  (T. 247).  Dr. Bragdon

---

[8] Dilantin is a trademark for phenytoin and is an anticonvulsant used to treat epislepsy and seizures associated with neurosurgery.  *Dorland's* at 527, 1453.  Phenobarbital is a long-acting barbiturate, used as a sedative, hypnotic, and anticonvulsant.  *Id.* at 1449.

[9] A positive Romberg test is an increase in clumsiness in all movements and uncertainty of gait when the patient's eyes are closed. *Id.* at 1922.

[10] A pseudoseizure is an attack resembling an epileptic seizure but having purely psychological causes; it lacks the electroencephalographic characteristics of epilepsy and the patient may be able to stop it by an act of will. *Id.* at 1569.  Tegretol is an anticonvulsant and antineuralgic, used in the treatment of pain associated with neuralgia and in epilepsy manifested by tonic-clonic and partial seizures.  *Dorland's* at 292, 1901.

noted that plaintiff's family history was "remarkable for having no seizure activity". (T. 247). At the beginning of the examination, Dr. Bragdon noted that plaintiff had "one of his spells" and described the episode stating that "his right hand began shaking. He was grabbing his knee. At this point his whole body began shaking. It lasted about 30 seconds and the patient was completely oriented postictally." (T. 248). Dr. Bragdon noted that neurologically, with the exception of the spell, the plaintiff was alert and oriented within minutes. (T. 248). Dr. Bragdon stated that plaintiff's physical examination was "unremarkable" and noted that the CT scan and EEG taken during the seizure were negative. (T. 247). Dr. Bragdon advised plaintiff that he could have controlled his spells, diagnosed plaintiff with pseudoseizure incidents and recommended that plaintiff gradually taper off of Dilantin and Tegretol. (T. 248). Dr. Bragdon noted that a sudden withdrawal of antiepileptic medication could cause plaintiff to have "real seizures". (T. 248). Dr. Bragdon concluded that plaintiff "will require no further antiepileptic drugs". (T. 249). Dr. Bragdon discharged plaintiff on September 27, 1995 with a referral to counseling by a specialist in convulsive disorders. (T. 249).

Tomy Kuttentharappel, M.D.

On October 17, 1995, plaintiff had a routine "check up" with Dr. Kuttentharappel, his family doctor at Lowville Health Center. (T. 339). Dr. Kuttentharappel noted that plaintiff was diagnosed with pseudoseizures and was taking Dinlantin and Tegretol. (T. 339). Dr. Kuttentharappel noted a history of Bell's Palsy, hypercholesterolemia and sexual dysfunction. (T. 339). Upon examination, Dr. Kuttentharappel stated that plaintiff was not in distress and that plaintiff's neurological examination was normal. (T. 339). Plaintiff advised Dr. Kuttentharappel that he was treating with a chiropractor for "disc prolapse" however, Dr. Kuttentharappel found

no evidence of disc prolapse. (T. 339).  Dr. Kuttentharappel advised plaintiff to continue treating

with the neurologist, chiropractor and psychiatrist. (T. 339).

On February 8, 1996, plaintiff returned to Dr. Kuttentharappel and complained of seizures

but had "no other complaints". (T. 340).  On May 9, 1996, plaintiff had a "routine check up" with

"no specific problems".  (T. 341).  Plaintiff continued to treat with Dr. Kuttentharappel from

August 1996 until September 2000. (T. 342-356).[11]  During that time, Dr. Kuttentharappel's

records indicate that plaintiff had a "history of depression" however, plaintiff never complained

of depression to Dr. Kuttentharappel and denied that he was depressed in February 1998. (T. 342-

451).

On September 27, 2000, Dr. Kuttentharappel indicated that plaintiff complained of back

pain after "hiking three weeks ago" and "doing some work outside".  (T. 355).  Upon

examination, Dr. Kuttentharappel found no spinal tenderness, straight leg raising was normal with

no sensory deficits. (T. 355).  Dr. Kuttentharappel diagnosed plaintiff with "probable

musculoskeletal pain" and prescribed Tylenol and Flexeril. (T. 355).

Lowville Mental Health Center/Bill Burkhard

On January 4, 1996, Bill Burkhard, plaintiff's therapist, provided information via

telephone to an analyst for the agency.  (T. 255).   Burkhard advised that plaintiff complained of

depression, "however his mood was neutral and his affect was appropriate". (T. 255).  Burkhard

stated that plaintiff was alert, oriented and had no difficulty concentrating. (T. 255).  Plaintiff

advised Burkhard that he had suicidal thoughts in the past but no hallucinations or

delusions. (T. 255).  Burkhard opined that plaintiff's social functioning was intact, he had no

---

[11] Dr. Kuttentharappel was plaintiff's "family doctor", therefore, plaintiff complained of various ailments/conditions during this time.  The conditions that are not relevant in this proceeding have been omitted.

difficulty functioning in daily living and that plaintiff could communicate and travel without difficulty. (T. 255).  Burkhard found that plaintiff could handle the stress of competitive employment and could manage his funds.  (T. 255).   Burkhard diagnosed plaintiff with "nicotine and caffeine dependence with adjustment disorder and mixed emotional features". (T. 255).

Jamal Emad, M.D.

On March 16, 1996, plaintiff was evaluated by Dr. Emad, a psychiatrist at Lewis County Community Medical Health Clinic. (T. 260).  Dr. Emad noted that plaintiff was referred for treatment of depression, insomnia and loss of appetite. (T. 260).  Plaintiff reported to Dr. Emad that he had seizures in the past but that tests showed that "they were not genuine seizures" and his medications were discontinued.  (T. 260).  Plaintiff advised Dr. Emad that he was taking Tylenol for back pain.  (T. 260).   Plaintiff reported problems with the behavior of his children but denied having suicidal thoughts. (T. 260).  Plaintiff stated that he was depressed and had "crying spells". (T. 260).  Upon examination, Dr. Emad noted that plaintiff was "pleasant, neat and clean", his speech was coherent, no bizarre behavior was noted and his gait was normal. (T. 261).  Dr. Emad noted that plaintiff's memory was good, insight and intelligence were adequate and he was well oriented. (T. 261).  Dr. Emad diagnosed plaintiff with dysthymia, noted that plaintiff needed psychiatric counseling and prescribed Sinequan. [12] (T. 261).

Plaintiff continued to treat with Dr. Emad, once a month, from March 1996 until September 1997. (T. 263, 272-275).  During that time, Dr. Emad continued to prescribe Sinequan. (T. 272-275, 374-375).  In June 1996, plaintiff advised Dr. Emad that his relationship with his

---

[12] Dysthymia is a mood disorder characterized by depressed feeling (sad, blue, low), loss of interest or pleasure in one's usual activities, and by at least some of the following: altered appetite, disturbed sleep patterns, lack of energy, low self esteem, poor concentration or decision-making skills, and feelings of hopelessness. *Dorland's* at 556.  Sinequan is an antidepressant used to treat depression, chronic pain, or ulcers. *Id*. at 572, 1743.

wife and family had improved and that he was "no longer depressed". (T. 272). Plaintiff also advised Dr. Emad that his appetite was good, he was sleeping well and had "no crying spells". (T. 272). From June 1996 until February 1997, plaintiff advised Dr. Emad that he had not been depressed and that he washed, cleaned, crocheted and occasionally cooked. (T. 274). Plaintiff noted some discord with his wife, issues with his children and financial difficulties but denied any suicidal ideas and indicated that he was sleeping well. (T. 273-275). In February 1997, Dr. Emad noted that plaintiff was "despondent" and "not sleeping well" due to his financial difficulties. (T .275).

On June 10, 1997, Dr. Emad completed a Medical Assessment of Ability to do Work-Related Activities (Mental). (T. 276). Dr. Emad noted that plaintiff's ability to follow work rules, relate with co-workers, use judgment and interact with supervisors was "good". (T. 276). Plaintiff's ability to deal with stress, function independently and maintain attention/concentration was "good to poor at times". (T. 276-277). Dr. Emad also indicated that plaintiff had a back injury that prevented him from lifting or standing "too long". (T. 277). Dr. Emad noted that plaintiff was occasionally depressed "for which he is taking medication". (T. 279). Dr. Emad opined that plaintiff could manage benefits in his own best interest. (T. 279).

On June 24, 1997, Dr. Emad noted that plaintiff "was angry and depressed" due to legal difficulties. (T. 374). Dr. Emad indicated that plaintiff was not taking Sinequan and requested another medication. (T. 374). Dr. Emad gave plaintiff a prescription for Zoloft.[13] (T. 374).

In July 1997 and August 1997, Dr. Emad noted that plaintiff was "doing better" and his "depression was somewhat reduced". (T. 374). Plaintiff still had financial difficulties and

---

[13] Zoloft is a used to treat depression, obsessive-compulsive, and panic disorders. *Dorland's* at 1724, 2120.

problems managing his children but had no suicidal thoughts, more ambition and was noted as "happier". (T. 374).  Dr. Emad prescribed Desyrel and Trazadone.[14]

On May 19, 1998, plaintiff saw Dr. Emad after a "long absence from the clinic". (T. 376).  Plaintiff complained that he suffered from insomnia and was angry and depressed. (T. 376).  Plaintiff advised Dr. Emad that financially he was "better" but that he was having relationship problems with his wife, difficulties with his children and sexual dysfunction. (T. 376).  In June 1998, Dr. Emad noted that plaintiff "continues to show improvement" and is "no longer depressed". (T. 376).  Plaintiff reported that he drank 30 cups of coffee per day. (T. 376).  Dr. Emad advised plaintiff to reduce his coffee intake and to continue with Desyrel.  (T. 376).

Plaintiff continued to treat with Dr. Emad, once a month from July 1998 until November 1999.  (T. 377-383).  During those visits, Dr. Emad continually noted that plaintiff's depression was "better" or "subsiding". (T. 374-383).  Plaintiff's ability to sleep fluctuated.  (T. 374-383).  Dr. Emad indicated that plaintiff was addicted to caffeine and advised plaintiff to reduce/discontinue his coffee intake and cigarette smoking as these habits could "reduce the effect of the antidepressant". (T. 378).   Dr. Emad also noted that this would help plaintiff in regard to his sleep patterns.  (T. 378).

Plaintiff first reported to Dr. Emad that he experienced panic attacks in September 1998. (T. 378).  Dr. Emad stated that the panic attacks were caused by plaintiff's coffee intake and referred plaintiff to Parkside Psychosocial Club to help overcome his boredom. (T. 378).   After attending Parkside, Dr. Emad noted that plaintiff appeared "enthusiastic". (T. 382).  In August 1999, plaintiff stated that he had panic attacks during the evening when his bedroom was dark. (T.

---

[14]Trazadone is an antidepressant used to treat major depressive episodes with or without prominent anxiety. *Id.* at 1983.  Desyrel is a trademark for the preparation of Trazadone.  *Id.* at 508.

382).  Dr. Emad advised plaintiff to smoke less in the evening. (T. 382).  In November 1999, during plaintiff's last visit with Dr. Emad, plaintiff reported no depressive episodes, no nightmares and no difficulties sleeping. (T. 383).  Dr. Emad noted plaintiff enjoyed his cooking sessions at Parkside. (T. 383).

Nalin Sinha, M.D.

On January 3, 2000, plaintiff was referred by Dr. Emad to Dr. Sinha, a psychiatrist at Lewis County Community Mental Health Center.  (T. 385).  Dr. Sinha noted that plaintiff had treated for the last two years and was taking anti-depressants for depressive symptomology.  Plaintiff reported to Dr. Sinha that he was "feeling depressed" and had difficulty sleeping.  (T. 385).  Dr. Sinha noted plaintiff was cooperative and open, his intelligence was average and his insight was fair. (T. 385).  Dr. Sinha found that plaintiff did not exhibit any agitation or irritability, or any other abnormal movements.  (T. 385).  Dr. Sinha diagnosed plaintiff with "dysthymic d/o in partial remission" and prescribed Remeron.[15]  (T. 386).

Plaintiff had eight visits with Dr. Sinha from February 2000 until September 2000. (T. 386 - 389).  During that time,  plaintiff was active at Parkside and contributed to the newsletter. (T. 386).  Plaintiff advised that he continued to have financial and marital difficulties. (T, 387).  Dr. Sinha repeatedly found plaintiff to be open, cooperative, and with fair insight. (T. 386 - 389).  During the visits, Dr. Sinha described plaintiff's moods as varying from agreeable to depressed and anxious. (T. 386-389).  In April 2000, plaintiff complained of panic attacks while driving which resulted in breathing difficulties. (T. 387).  Dr. Sinha prescribed BuSpar to address

---

[15] Remeron is an antidepressant compound unrelated to any of the classes of anti-depressants. *Dorland's* at 1186, 1646.

plaintiff's panic disorder/attacks. [16] (T. 387).  In May 2000, Dr. Sinha described plaintiff as "anxious" and noted plaintiff was having marital troubles. (T. 388).  In July and August 2000, plaintiff continued to complain of panic attacks while near water and driving.  (T. 388-399).  Dr. Sinha noted that plaintiff had no side effects from the medication and that it was necessary that he continue to take it to keep "stable". (T. 389).  In September 2000, during plaintiff's last visit with Dr. Sinha, plaintiff was described plaintiff as "happy" as he was going to be a grandfather. (T. 389).

On October 2, 2000, Dr. Sinha completed a Medical Assessment of Ability to do Work Related Activities (Mental). (T. 394).  Dr. Sinha opined that plaintiff's ability to follow work rules was "unlimited". (T. 394).  Dr. Sinha stated that plaintiff's ability to deal with the public, use judgment, function independently and concentrate was "fair". (T. 394).   Dr. Sinha was unable to comment on plaintiff's performance adjustments or personal/social adjustments and stated that "we have never observed him in a work setting". (T, 395).

On January 10, 2001, Dr. Sinha responded to a request for information from plaintiff's counsel. (T. 450).  Dr. Sinha stated that plaintiff suffered from depression and under certain circumstances, anxiety which presented as panic attacks. (T. 450).  Dr. Sinha stated that both conditions are controlled with medication and psychotherapy. (T. 450).  Dr. Sinha refused to comment on plaintiff's ability to perform in the workforce including plaintiff's ability to interact with supervisors and co-workers. (T. 450).  Dr. Sinha opined that plaintiff does not have a permanent psychiatric disability but recommended continued treatment at that time. (T. 450).

---

[16] BuSpar is an antianxiety agent used in the treatment of anxiety disorders and for short-term relief of anxiety symptoms; it is not related chemically or pharmacologically to the benzodiazepines, barbiturates, or other sedative/anxiolytic agents. *Id*. at 269.

Ergos Work Recovery, Inc.

On October 9, 2000, plaintiff was evaluated at Ergos by William M. Blunden, a physical therapist to "determine extent of disability". (T. 401). Plaintiff was referred to Ergos by Dr. Kuttentharappel. (T. 401). Blunden stated that plaintiff was very cooperative but apprehensive due to his constant back pain which he described as an "8/10 pain level". (T. 401). During the evaluation, plaintiff was rated after performing various activities including lifting, carrying, pushing, pulling, standing, sitting, climbing stairs, balancing, stooping, kneeling, crouching, reaching, handling, talking, hearing and seeing. (T. 405-409). Blunden noted that plaintiff had some "deconditioning" but otherwise, his evaluation was "unremarkable". (T. 410). Blunden note that plaintiff was able to assume all positions required to complete the activities without any restriction in his range of motion. (T. 410).

A Medical Assessment of Ability to Do Work Related Activities (Physical) was prepared at Ergos.[17] The evaluator concluded that plaintiff could continuously carry 11 to 20 pounds, frequently carry 20 to 50 pounds and occasionally carry 51 to 100 pounds. (T. 397). The evaluator noted that plaintiff could sit for 5 hours in an 8 hour workday and stand and walk for a full day. (T. 398).

Lewis County General Hospital Radiology [18]

On January 9, 2002, plaintiff had an MRI of his lumbar spine taken at Lewis County

---

[17] The assessment is unsigned and undated. The person who completed the assessment is not identified in the record.

[18] This evidence, and the August 2002 records from Samaritan Medical Center and Dr. Wiebe, post-date the ALJ's decision. It is part of the administrative record because it was submitted to and expressly considered by the Appeals Council and for this reason it is set forth above.

Hospital at the request of Steven L. Lyndaker, M.D.[19] (T. 294).  The MRI report indicated that plaintiff suffered from degenerative disc disease at L4-5 with disc bulge and facets that cause some moderate stenosis.  (T. 294).  The radiologist reported "no compression of the nerve root clearly demonstrated and no disc herniation". (T. 294).

Samaritan Medical Center/Timothy Wiebe, M.D.

On August 14, 2002, plaintiff was admitted to Samaritan Medical Center by Dr. Wiebe with a diagnosis of lumbar spinal stenosis. (T. 288).  Dr. Wiebe noted that he had "followed Mr. Hirschey for unrelenting low back pain which has plagued him for several years".[20] (T. 288).  Dr. Wiebe noted that plaintiff's January 9, 2002 MRI studies "show[ed] disc herniation at L4-5 with spondylotic changes that extend to the lumbosacral junction combining for lumbar stenosis". (T. 289).  On August 15, 2002, plaintiff underwent a laminectomy and medial facetectomy. (T. 291).

**B.    Consultative Examinations**

Joseph A. Kelly, M.D.

On March 3, 1995, plaintiff was examined by Dr. Joseph Kelly, an orthopedist, at the request of the State of New York Department of Civil Service (plaintiff's employer). (T. 218). Dr. Kelly noted that plaintiff complained of low back pain and right leg pain weakness with prolonged standing, walking, bending or lifting significant weight. (T. 219 - 220).  Dr. Kelly noted that plaintiff had not treated with an orthopedist.  (T. 220).  Upon examination, Dr. Kelly noted that plaintiff was in no distress and that he was able to disrobe for the examination.  (T. 220).  Dr. Kelly observed plaintiff walk with a right sided limp and noted that muscle spasms

---

[19] The record does not contain any reports or records from Dr. Lyndaker.

[20] The record is devoid of any other records or notations from Dr. Wiebe other than his August 15, 2002 report.

were present in his lower back with limited forward flexion due to pain. (T. 221). Dr. Kelly noted that plaintiff exhibited limited hyperextension, could only bend to knees and straight leg raising caused pain at 80 degrees which was worse on the right side. (T. 221). Dr. Kelly opined that plaintiff's condition was "too symptomatic" to enable him to perform full unrestricted work. (T. 218). Dr. Kelly found that plaintiff could perform work that required no repetitive lifting over 20 - 25 pounds and no prolonged standing or walking. (T. 218).

On May 5, 1995, Dr. Kelly re-examined plaintiff. (T. 228 - 231). Dr. Kelly reviewed x-rays of plaintiff's lumbar spine performed on March 8, 1995 and MRI films taken on April 12, 1995. (T. 230). Dr. Kelly noted that plaintiff was not taking any medication for his leg and back pain. (T. 230). Upon examination, Dr. Kelly found that plaintiff walked with a limp on the right. (T. 231). Dr. Kelly noted that all movements of the low back were limited in all directions, no tenderness was present to palpation but spasms were evident. (T. 231). Dr. Kelly indicated that straight leg raising to 40 degrees produced pain on the right but plaintiff was able to raise to 80 degrees on the left without pain. (T. 231). Dr. Kelly concluded that plaintiff's condition had worsened since March and that plaintiff could not work in any capacity. (T. 232).

Richard Christiana, D.C.

On March 16, 1995, plaintiff underwent a chiropractic examination by Richard Christiana, D.C., at the request of the State Insurance Fund. Plaintiff advised Dr. Christiana that he was injured on March 13, 1993 when he bent over to pick something up off of the floor at work and his "back snapped". (T. 224). Plaintiff told Dr. Christiana that his employer took him out of work on February 8, 1995 as they were not able to accommodate the recommendations of Dr. Kelly. (T. 224). Dr. Christiana noted that plaintiff received weekly chiropractic treatment from Dr.

18

Hoover. (T. 224).   Plaintiff advised Dr. Christiana that he experienced improvement and that he was able to stand and walk for longer periods of time.  (T. 224).  Upon examination, Dr. Christiana noted that plaintiff's gait and movement were normal and all other objective tests were normal.  (T. 225-226).  Dr. Christiana diagnosed plaintiff with lumbosacral strain with sciatic neuralgia, recommended an MRI and suggested that plaintiff receive adjustments until the study was conducted. (T. 223-225).

On February 4, 1997, plaintiff was re-examined by Dr. Christiana.  (T. 266).  Dr. Christiana noted that plaintiff had "no gains since last exam due to additional non work trauma" and had not seen Dr. Hoover for chiropractic treatments in two months.  (T. 267).  Upon examination, Dr. Christiana found that plaintiff's movements were normal, heel/toe walk was performed without difficulty, straight leg raising was negative on the right and restricted on the left due to hamstring tightness and not pain or discomfort. (T. 267-269).  Dr. Christiana diagnosed plaintiff with vertebrogenic right sided sciatic which was aggravated by a fall at home.  (T. 267).  Dr. Christiana suggested that plaintiff seek treatment in a rehabilitation setting as he had reached maximum chiropractic improvement. (T. 266).

<u>Mulazim Khan, M.D.</u>

On November 22, 1995, plaintiff was examined by Dr. Mulazim Khan, at the request of the agency.[21]  (T. 250).  Plaintiff stated that he was taking Tylenol for his pain as needed. (T. 251).  Upon examination, Dr. Khan found that plaintiff's gait was normal but that palpation of the lumbar spine caused the plaintiff to "jump with pain".  (T. 252).  Dr. Khan noted that plaintiff had restrictions in movement in the lumbar spine, straight leg raising was positive at 60 degrees on the

---

[21] The record does not indicate whether Dr. Khan is specialized in any area of medicine.

right and 80 degrees on the left. (T. 252). Dr. Khan noted that plaintiff was able to perform a heel/toe walk "clumsily" and could bend forward to 80 degrees. (T. 252). Dr. Khan diagnosed plaintiff with chronic low back pain. (T. 252).

Residual Physical and Mental Functional Capacity Assessments

The record contains a Residual Physical and Mental Functional Capacity Assessment completed by Dr. Richard B. Weiss, on January 10, 1996 at the request of the agency. (T. 83). The record contains a second Residual Physical Functional Capacity Assessment completed by Dr. Deborah Bostic on July 10, 1996 at the request of the agency. (T. 112-119). [22]

## C.    Administrative Hearing

On December 20, 2000, plaintiff testified at a hearing before the Administrative Law Judge. (T. 451). Plaintiff stated that he suffered from a back injury but that he considered his depression and anxiety to be his most serious problems. (T. 469). Plaintiff testified that he suffered from panic attacks three times a week that were precipitated by being around people. (T. 470). Plaintiff testified that it takes him one to two hours to recover from a panic attack. (T. 512). Plaintiff stated that he was taking BuSpar and Remeron for his panic attacks and depression stated that the BuSpar made him "feel relaxed" and "buzzed" for an hour. (T. 512). Plaintiff testified that his back pain is "constant" and that he treated with a chiropractor but had no other medical treatment for his back. (T. 475). Plaintiff testified that his pain level in his back reaches a "nine out of ten" at least five or six times a day. (T. 476-477). Plaintiff stated that he takes over-the counter medication for his back pain. (T. 477).

The ALJ posed a series of questions to plaintiff regarding his physical abilities. Plaintiff

_____

[22] Plaintiff does not object to the weight afforded to these assessments by the ALJ. As such, the details of the assessments are not recited herein.

testified that he could sit for 1 hour, stand for 15 to 20 minutes and walk for 30 minutes. (T. 486). Plaintiff stated that he could lift, carry, pull and/or push about five pounds. (T. 487). Plaintiff testified that he was unable to stoop or crouch but that he could bend, kneel and crawl for a limited amount of time. (T. 486-491). Plaintiff testified that he could climb stairs with a railing, climb a stepladder and could maintain his balance 75% of the time. (T. 493). Plaintiff testified that he had problems with reaching and grasping and sensitivity to certain odors like perfume. (T. 496). Plaintiff stated he has no memory problems but that he cannot concentrate well and loses his temper three times a day and has problems relating to females. (T. 498)

The ALJ questioned plaintiff regarding his daily activities. Plaintiff testified that he was able to bathe, dress, feed, cook, shop, wash dishes, do laundry, make his bed, dust, sweep, vacuum and care for children. (T. 500-503). As for home repairs, plaintiff stated that he could replace a light bulb, plunge a toilet, mow the lawn (limited), rake leaves, pull weeds and shovel snow (limited). (T. 503). Plaintiff testified that he is able to read, watch television, play cards, eat outside the home, go to the movies, go to church, crochet and exercise (walking or swimming). (T. 505-506). Plaintiff testified that he attended Parkside House twice a week. (T. 507).

## IV.    ADMINISTRATIVE LAW JUDGE'S DECISION

The Social Security Act (the "Act") authorizes payment of disability insurance benefits to individuals with "disabilities." The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). There is a five-step analysis for evaluating disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." The claimant bears the burden of proof on the first four steps, while the Social Security Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal citations omitted).

In this case, the ALJ found at step one that plaintiff has not engaged in gainful activity since the filing date of his application. (T. 307). At step two, the ALJ concluded that plaintiff suffered from degenerative disc disease of the spine, a depressive disorder and pseudoseizures which qualified as a "severe impairments" within the meaning of the Social Security Regulations (the "Regulations"). (T. 317). At the third step of the analysis, the ALJ determined that plaintiff's impairments did not meet or equal the severity of any impairment listed in Appendix 1 of the Regulations. (T. 317). At the fourth step, the ALJ found that plaintiff had the following residual functional capacity ("RFC"):

> to lift and/or carry more than twenty pounds occasionally or ten pounds frequently; no work around unprotected heights, no climbing of ladders, ropes or scaffolds; no more than simple, repetitive tasks in a low stress environment with low production quotas and minimal interaction with the public or co-workers. (T. 317).

Accordingly, the ALJ found that plaintiff could perform a limited range of light level work but concluded that he was unable to perform all of his past relevant work. (T. 317). Since plaintiff claimed that he suffered from exertional and non-exertional limitations, the ALJ obtained the testimony of a vocational expert to determine whether there were jobs plaintiff could perform. Based upon the vocational expert's testimony, the ALJ concluded at step five, that there were a

significant number of occupations in the regional and national economy that plaintiff could perform, such as a sorter or dispatcher. (T. 316).  Therefore, the ALJ concluded that plaintiff was not under a disability as defined by the Social Security Act.  (T. 316).

## V.    DISCUSSION

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence."  42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000).  Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*  The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

Plaintiff argues that: (1) the ALJ failed to specify which impairments he found to be severe;  (2) the ALJ failed to follow the treating physician rule and afford the proper weight to the opinions of Drs. Hoover, Kelly, Emad and Sinha; (3) the ALJ erred in evaluating plaintiff's credibility; (4) the RFC determination by the ALJ is not supported by substantial evidence; and (5) the ALJ improperly relied upon the testimony of the vocational expert and thus, the Commissioner did not sustain his burden of proof at the fifth step of the sequential evaluation process.

## A.    Severity

Plaintiff alleges that the ALJ failed to specify which of plaintiff's impairments were severe and consequently, which impairments affect his ability to work as required by 20 CFR §§ 404.1520(c), 416.920(c) and SSR 86-8p.  (Dkt. No. 6, p. 16).[23]  Specifically, plaintiff claims that

---

[23] Defendant did not provide a response to this contention.

this error ultimately rendered the assessment of plaintiff's residual functional capacity unreliable.[24]

If an applicant alleges more than one impairment, the Commissioner is obligated to individually evaluate each impairment for severity. *See* 20 C.F.R. § 404.1520(a)(4); *McEaney v. Comm'r of Social Sec.*, 2008 WL 647551, at *2 (N.D.N.Y. 2008). However, an ALJ's failure to make specific findings as to each impairment is harmless error if the record clearly reflects that the ALJ considered each impairment. *Provost-Harvey v. Comm'r of Social Sec.*, 2008 WL 697366, at *6 (N.D.N.Y. 2008); *see also Ortiz v. Shalala*, 1994 WL 481921, at *3 (S.D.N.Y. 1994) (holding that although the ALJ never made an explicit statement, reading the opinion as whole, it was clear what impairments the ALJ found limited plaintiff's ability to work).

In this case, the ALJ stated:

> The medical evidence establishes that the claimant has the following medically determinable impairments: degenerative disc disease of the spine, a depressive disorder and pseudoseizures. The claimant's impairments significantly limit his ability to perform basic work activities. Therefore, there is a "severe" impairment. (T. 317).

The ALJ further stated that "[t]he claimant's impairments neither meet, nor equal, the requirements for any impairment listed in Appendix 1 to Subpart P, Regulations No. 4". (T. 317). A review of the entire decision reveals that the ALJ found that plaintiff's low back pain and depressive disorder impacted his ability to do work. The ALJ specifically discussed plaintiff's seizure disorder and concluded that based upon the medical evidence and plaintiff's own testimony, the "condition is under control". (T. 310, 312). As noted by the ALJ, all objective testing, including an EEG, CT scan of plaintiff's brain and MRI of plaintiff's brain, were normal. (T. 243, 246, 310). At the time of the

---

[24] The analysis of whether or not the ALJ properly assessed plaintiff's RFC is discussed *infra*.

administrative hearing, plaintiff testified that he was not taking any anti-seizure medication. (T. 471-472; 484).  The ALJ also noted that plaintiff had not been treated for his seizures by Dr. Bragdon since September 1995 and the last record of any complaint of seizures was February 1996. (T. 312, 313).

Accordingly, the Court finds that substantial evidence exists to support the ALJ's determination regarding which of plaintiff's impairments impacted his ability to work.

**B.    Treating Physician Rule**

Plaintiff argues that the ALJ improperly rejected the opinions of his treating physicians. (Dkt. No. 6, pp. 11-16).  Plaintiff asserts that the opinions were supported by diagnostic evidence and consistent with substantial evidence in the record and therefore, entitled to controlling weight. (Dkt. No. 6, p. 15).  Further, plaintiff claims that rather than dismissing the opinions, the ALJ was required to correspond with the doctors to further develop their opinions. (Dkt. No. 6, p. 16). Specifically, plaintiff refers to the opinions of Drs. Kelly, Hoover, Emad and Sinha. (Dkt. No. 6, p. 15).  The Commissioner argues that the ALJ properly  considered clinical and laboratory findings, consistency of the evidence and the opinions of all of the treating and examining physicians.  (Dkt. No. 16, p. 13).

Under the regulations, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with substantial evidence in [the] case record."  20 C.F.R. § 404.1527(d)(2); *see also Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999); *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993); *see also Filoramo v. Apfel*, 1999 WL 1011942, at *7 (E.D.N.Y. 1999) (holding that the ALJ properly discounted the assessment of a treating physician

as it was inconsistent with opinions of other treating and consulting physicians).   The ALJ is required to accord special evidentiary weight to the opinion of the treating physician, as long as the treating physician's opinion is supported by medically acceptable techniques, results from frequent examinations, and is supported by the administrative record. *Schnetzler v. Astrue*, 533 F.Supp.2d 272, 285 (E.D.N.Y. 2008); *Miller v. Barnhart,* 2003 WL 749374, at *7 (S.D.N.Y. 2003) (holding that the ALJ's conclusion that the opinion of the treating physician should not be controlling is adequately supported by the fact that physician met with the plaintiff only once in 1995 and only four times in 1996).   An ALJ may refuse to consider the treating physician's opinion controlling if he is able to set forth good reason for doing so.  *Barnett v. Apfel*, 13 F. Supp.2d 312, 316 (N.D.N.Y. 1998).   When an ALJ refuses to assign a treating physician's opinion controlling weight, he must consider a number of factors to determine the appropriate weight to assign, including:

> (i) the frequency of the examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

20 C.F.R. 404.1527(d)(2).  The opinion of the treating physician is not afforded controlling weight where the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts.  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *see also Veino*, 312 F.3d 578, 588 (2d Cir.2002) (treating physician's opinion is not controlling when contradicted "by other substantial evidence in the record"); 20 C.F.R. § 404.1527(d)(2).  An opinion that is not based on clinical findings will not be accorded as much weight as an opinion that is well-supported.  20 C.F.R. § 404.1527(d)(3), 416.927 (d)(3);

*see also Stevens v. Barnhart*, 473 F.Supp.2d 357, 362 (N.D.N.Y. 2007).  Similarly, the less

consistent an opinion is with the record as a whole, the less weight it is to be given.  *Stevens*, 473

F.Supp.2d at 362; *see also Otts v. Comm'r of Social Sec.*, 2007 WL 2914449, at *2 (2d Cir. 2007)

(an ALJ may reject such an opinion of a treating physician upon the identification of good

reasons, such as substantial contradictory evidence in the record).   Genuine conflicts in the

medical evidence are for the Commissioner to resolve.  *Veino*, 312 F.3d at 588.

       The regulations direct the Commissioner to "give good reasons in [his] notice of

determination or decision for the weight [he] give[s] [claimant's] treating source's opinion".  *Id.*;

accord 20 C.F.R. 416.927(d)(2).

       **1.    Drs. Emad and Sinha**

       Plaintiff argues that the ALJ erred when he afforded "no weight" to the opinions of Dr.

Emad and only "some weight" to the opinions of Dr. Sinha. (Dkt. No. 6, p. 15).   On June 10,

1997, Dr. Emad concluded that plaintiff's ability to deal with work stresses, function

independently and concentrate was "good to poor at times" and that plaintiff  "was occasionally

depressed for which he is taking medication". (T. 277-279).  The ALJ did "not give any weight"

to this opinion and stated that:

       ". . . when asked to furnish the findings to support his opinion, Dr. Emad stated the
       claimant had a back injury and he was occasionally depressed.  Such findings are not
       persuasive of a disabling mental impairment.  Further, Dr. Emad's own treating
       records include few serious findings associated with a depressive disorder.  To the
       contrary, he often described the claimant as not depressed." (T. 315).

The Court finds that the ALJ applied the appropriate legal standard and that substantial evidence

exists to support the weight afforded to Dr. Emad's opinions.  From March 1995 until April 1997,

Dr. Emad's treatment notes indicated that plaintiff was "less depressed", "no longer depressed",

"pleasant" or that his "depression has subsided". (T. 272-274 ).  Dr. Emad's opinions regarding

plaintiff's depression are contradicted by Dr. Kuttentharappel, Bill Burkhard (plaintiff's therapist)

and by Dr. Emad's colleague, Dr. Sinha.

Dr. Emad's opinions regarding plaintiff's back injury are also unsupported by the record.

During his initial examination of plaintiff, Dr. Emad indicated that plaintiff's gait was normal. (T.

261).  Dr. Emad commented on plaintiff's back pain on only two occasions and stated that

"because of his back he's unable to lift or bend" and  "he's continuing to have back pain". (T.

272-273).  Other than those two notations, the remainder of Dr. Emad's records are devoid of any

reference to plaintiff's treatment for his back pain.  Dr. Emad's notes merely repeat the plaintiff's

complaints of pain. *See Filoramo v. Apfel*, 1999 WL 1011942, at *7 (E.D.N.Y. 1999).  Dr.

Emad's opinions are contradicted by other treating and examining physicians and objective

testing.  Dr. Kuttentharappel examined plaintiff numerous times from 1995 through 2000 and

never treated or commented on plaintiff 's back pain other than a diagnosis in September 2000 of

"probable musculoskeletal pain".  (T. 355).   William Blunden, the physical therapist from

ERGOS found plaintiff was "able to perform all activities required".  (T. 398).  Dr. Khan

diagnosed plaintiff with "chronic back pain" and Dr. Christiana stated that plaintiff suffered from

lumbosacral strain with sciatica. (T. 223, 252)  The MRI and x-rays of plaintiff's lumbar spine do

not support Dr. Emad's opinion that plaintiff's back condition limited plaintiff's ability to adjust

to a job.  Thus, the ALJ applied the proper legal standard and weight to Dr. Emad's opinions.

The ALJ also discussed Dr. Sinha's opinions and gave "some weight to the opinion

because it is consistent with the evidence in the record as a whole".  (T. 315).  The ALJ found that

Dr. Sinha's records "are not supportive of a mental disorder of disabling severity".  (T. 311).

Upon review of the record, the Court finds that the ALJ properly afforded Dr. Sinha's opinions

"some weight" and pursuant to the regulations, adequately outlined the inconsistencies with other

evidence in the record. *See Lucas v. Barnhart*, 160 Fed.Appx. 69 (2d Cir. 2005).   Dr. Sinha

diagnosed plaintiff with depression, anxiety and panic attacks.  (T. 250).  Dr. Sinha stated that

plaintiff's abilities to adjust to a job are "fair".  (T. 394).  The ALJ noted that Dr. Sinha treated

plaintiff from January 2000 until September 2000. (T. 311).  A review of the record reveals that

Dr. Sinha examined plaintiff a total of eight times. (T. 385-389).  In Dr. Sinha's treatment notes,

Dr. Sinha found plaintiff to be "cooperative and open" and "compliant with medication". (T. 385-

389).  During Dr. Sinha's more recent examinations in August and September 2000, Dr. Sinha

noted that plaintiff was "doing relatively well and stable", had "satisfaction and progress

regarding his mood" and that plaintiff denied "any problems with his sleep, appetite or mood". (T.

389).  In addition, Dr. Sinha repeatedly concluded that plaintiff's physical and mental

examinations were "normal". (T. 385-389).   Thus, Dr. Sinha's opinions are contradicted by his

own treatment records.  Dr. Sinha's opinions are further contradicted by the treatment records of

Dr. Emad, Bill Burkhard and Dr. Kuttentharappel as well as plaintiff's own testimony.

  Therefore, the ALJ's decision to give "some weight" to the opinion of Dr. Sinha is

consistent with substantial evidence in the record.  The ALJ adequately explained his reasons for

refusing to afford the opinions of Drs. Emad and Sinha controlling weight.  Accordingly, the

ALJ's determination will not be displaced.

  **2. Dr. Hoover's opinions**

  Plaintiff argues that the ALJ did not afford the appropriate weight to Dr. Hoover's

opinions and that the ALJ should have applied the "treating physician rule".  (Dkt. No. 6, p. 15).

Defendant asserts that Dr. Hoover was not a "treating source" and therefore, his opinion was not entitled to controlling weight. (Dkt. No. 16, p. 16).

According to the regulations, a chiropractor's opinion is not a medical opinion. *Diaz v. Shalala*, 59 F.3d 307, 313 (2d Cir. 1995). Therefore, the treating physician rule does not apply to chiropractors. *Diaz,* 59 F.3d at 313; *see also Kim v. Barnhart,* 2005 WL 1107048, at *8 (S.D.N.Y. 2005). The regulations provide that medical opinions are statements from physicians and psychologists or "other acceptable medical" sources. *See* 20 C.F.R. § 404.1527(a)(2). Chiropractors are expressly listed as "other sources" whose "[i]nformation ... may also help us to understand how your impairment affects your ability to work." *See* 20 C.F.R. § 404.1513(e); *see also Diaz*, 59 F.3d at 313. It is within the ALJ's discretion to determine what weight, if any, to accord to the opinions of a chiropractor. *See Rodriguez v. Barnhart*, 2004 WL 2997876, at *8 (S.D.N.Y. 2004); *see also Diaz*, 59 F.3d at 314 (holding that under no circumstances can the regulations be read to require the ALJ to give controlling weight to a chiropractor's opinion.).

In this case, the ALJ gave "no weight to Dr. Hoover's opinion made in February 1996 for a number of reasons". (T. 314). The ALJ found that the opinion was "not well-supported by the objective evidence", "not consistent with the findings of other acceptable medical sources" and "his opinion is also given less weight because he is not an acceptable medical source". (T. 314). The ALJ also found that Dr. Hoover's March 1996 functional assessment of plaintiff's ability to "lift is not consistent with plaintiff's own complaints". (T. 314). The Court finds that the ALJ applied the appropriate legal standard and afforded the proper weight to Dr. Hoover's opinions.

Dr. Hoover's opinions are inconsistent with his treatment records, the objective medical evidence, the opinions of other examining physicians and plaintiff's testimony. Dr. Hoover

ordered and reviewed three sets of x-rays of plaintiff's lumbar spine and one MRI study of plaintiff's lumbar spine and noted they were "negative"; "may indicate a strained muscle"; "unremarkable"; and demonstrated that "heights and disc spaces maintained". (T. 196).  In June 1995, after reviewing those films, Dr. Hoover diagnosed plaintiff with a lumbar strain and stated plaintiff could return to work, with inactivity "contra-indicated". (T. 202).   In October 2000, Dr. Hoover provided a functional assessment that does not support the opinions expressed in February and March 1996.  (T. 435).

In addition to the objective testing, the records from Lewis County General Hospital,  Dr. Kuttentharappel, William Blunden at Ergos, Dr. Christiana and Dr. Khan all contradict Dr. Hoover's assessments. (T. 264, 342-355; 401-410).   Further, plaintiff's own statements are in conflict with Dr. Hoover's assessments.  Plaintiff stated that he has never taken any medication other than over-the-counter medication for his back/leg pain; he can lift about five pounds; and is capable of performing a plethora of activities.  (T. 251, 260, 470; 486-503).

 Accordingly, the Court finds that there is substantial evidence to support the ALJ's determination that Dr. Hoover's opinions were not entitled to any weight. (T. 314).

### 3.    Dr. Kelly's Opinions

Plaintiff argues that Dr. Kelly was a "treating physician" and alleges that the ALJ failed to afford proper weight to Dr. Kelly's opinions.  (Dkt. No. 6, p. 15).  The Court disagrees.  A treating source is defined as a plaintiff's own physician or psychologist who has provided plaintiff with medical treatment or evaluation and who has had an ongoing treatment relationship with the plaintiff".  *Fernandez v. Apfel*, 1998 WL 812591, at *3 (E.D.N.Y. 1998) (citing 20 C.F.R.§ 404.1502).  The treating physician rule does not apply to consulting doctors.  *See Jones v.*

*Shalala*, 900 F.Supp. 663, 669 (S.D.N.Y.1995); *see also Limpert v. Apfel*, 1998 WL 812569, at *6 (E.D.N.Y. 1998). Accordingly, the ALJ was entitled to give less weight to the opinions of a consulting doctor than to the opinions of treating sources. 20 C.F.R. § 404.1527(d)(2); *see Schaal v. Apfel*, 134 F.2d 496, 504 (2d Cir. 1997); *Moya v. Chater*, 1996 WL 87244, at *6 (S.D.N.Y. 1996); *see also Crespo v. Apfel*, 1999 WL 144483, at *7 (S.D.N.Y. 1999) ("In making a substantial evidence evaluation, a consulting physician's opinions or report should be given limited weight" because "they are often brief, are generally performed without benefit or review of the claimant's medical history and, at best, only give a glimpse of the claimant on a single day.").

The Court finds that the ALJ properly assigned "little weight" to Dr. Kelly's opinions. (T. 314). The ALJ stated that the opinion was "given during a brief period when the claimant's back condition was accompanied by serious findings that were no longer present on subsequent examinations by other sources" and that the plaintiff's "condition improved significantly after Dr. Kelly last examined him in May 1995". (T. 314). The ALJ found that Dr. Kelly's assessments were not consistent with the opinions of plaintiff's treating physicians, Drs. Latif, Bragdon and Kuttentharappel. (T. 309). Further, the ALJ found that Dr. Kelly's assessments were in conflict with the opinions expressed by the attending physician at Lewis County General Hospital and by another consultative physician, Dr. Khan. (T. 264, 314). The ALJ noted that Dr. Kelly examined plaintiff only twice at the request of plaintiff's employer, the New York State Department of Civil Service. (T. 309, 314).

Accordingly, the Court finds that substantial evidence exists to support the weight afforded by the ALJ to Dr. Kelly's opinions.

**4.      ALJ's duty to develop record**

Plaintiff contends that the ALJ was obligated to contact the treating physicians to further develop the record prior to rejecting their opinions. (Dkt. No. 6, p. 16). The Court finds this argument to be without merit. By statute, the ALJ is required to develop the complete medical history for at least a twelve-month period prior to the date of application. *See* 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. § 416.912(d)(2). The ALJ does not need to attempt to obtain every extant record of the claimant's doctor visits when the information on the record is otherwise sufficient to make a determination, and need not request more detailed information from the treating physician if the physician's report is a sufficient basis on which to conclude that the claimant is not disabled. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999). In *Rebull v. Massanari*, 240 F.Supp.2d 265, 273 (S.D.N.Y. 2002), the court held:

> This aspect of the fact-finding function, a credibility determination, in essence, would be rendered nugatory if, whenever a treating physician's stated opinion is found to be unsupported by the record, the ALJ were required to summon that physician to conform his opinion to the evidence. Such a standard, in turn, would invite additional critique by the Commissioner in opposition and conceivably demand another recall of the treating physician, ad infinitum. Reasonable discretion in the assessment of the adequacy and completeness of the administrative record circumscribes this potential vicious cycle.

In this case, plaintiff filed his application for benefits on September 20, 1995. (T. 77, 124). The record contains reports from March 1993 until August 2002, well beyond the statutorily mandated time period. The Court finds that substantial evidence exists to support the ALJ's conclusions without the need for further evidence or clarification from the treating physicians. After reviewing the administrative transcript, the Court finds that the record adequately and completely reflected plaintiff's medical history. Accordingly, the ALJ had no obligation to contact plaintiff's treating physicians to supplement the existing record.

Thus, with respect to the opinions expressed by treating physicians, consultative

examiners and other medical sources, the Court finds that the ALJ afforded the appropriate

weight to the opinions of Drs. Emad, Sinha, Hoover and Kelly.

**C.     Credibility**

Plaintiff argues that the ALJ did not properly assess the plaintiff's credibility. (Dkt. No. 6,

p. 20).  Plaintiff claims that the ALJ failed to consider his "good work record" as a factor in

assessing his credibility .  (Dkt. No. 6, p. 21). Defendant asserts that substantial evidence supports

the ALJ's finding that plaintiff's subjective complaints were not fully credible. (Dkt. No. 6, p.

12).

It is well settled that "a claimant's subjective evidence of pain is entitled to great weight

where . . . it is supported by objective medical evidence".  *Simmons v. U.S.R.R. Retirement Bd.*,

982 F.2d 49, 56 (2d Cir. 1992) (citations omitted).  "Objective medical evidence is evidence

obtained from the application of medically acceptable clinical and laboratory diagnostic

techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor

disruption." *Casino-Ortiz v. Astrue*, 2007 WL 2745704, at *11, n. 21 (S.D.N.Y. 2007) (citing 20

C.F.R. § 404.1529(c)(2)) .  The ALJ retains discretion to assess the credibility of a claimant's

testimony regarding disabling pain and "to arrive at an independent judgment, in light of medical

findings and other evidence, regarding the true extent of the pain alleged by the claimant."

*Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979); *Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir.

1999) (holding that an ALJ is in a better position to decide credibility).

If plaintiff's testimony concerning the intensity, persistence or functional limitations

associated with her pain is not fully supported by clinical evidence, the ALJ must consider

additional factors in order to assess that testimony, including: 1) daily activities; 2) location,

duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4)

type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received;

and 6) other measures taken to relieve symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi),

416.929(c)(3)(i)-(vi). The issue is not whether the clinical and objective findings are consistent

with an inability to perform all substantial activity, but whether plaintiff's statements about the

intensity, persistence, or functionally limiting effects of her neck and back pain are consistent

with the objective medical and other evidence. *See* SSR 96-7p, 1996 WL 374186, at *2 (S.S.A.

1996). A claimant's subjective symptoms must be supported by medical signs or conditions that

reasonably could be expected to produce the disability or alleged symptoms based on a

consideration of all the evidence. *Pareja v. Barnhart*, 2004 WL 626176, at *10 (S.D.N.Y. 2004)

(concluding that despite plaintiff's subjective complaints, the ALJ noted that several physicians

determined that plaintiff could do medium work based on her medical records and on their own

evaluations of her test results). One strong indication of credibility of an individual's statements

is their consistency, both internally and with other information in the case record. SSR 96-7p,

1996 WL 274186, at *5 (S.S.A. 1996).

After considering plaintiff's subjective testimony, the objective medical evidence, and any

other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony.

*Martone v. Apfel*, 70 F. Supp.2d 145, 151 (N.D.N.Y. 1999); *see also* 20 C.F.R. §§ 404.1529(c)(4),

416.929(c)(4). An ALJ rejecting subjective testimony must do so explicitly and with specificity

to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and

whether his decision is supported by substantial evidence. *Melchior v. Apfel*, 15 F.Supp.2d 215,

220 (N.D.N.Y. 1998) (quoting *Brandon v. Bowen*, 666 F.Supp 604, 608 (S.D.N.Y. 1987))

(citations omitted). The ALJ is better able than the Court to assess the credibility of plaintiff's

testimony in light of the medical and non-medical evidence, and his credibility determination is

entitled to substantial deference. *See Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984).

While "[a] claimant with a good work record is entitled to substantial credibility when claiming an inability to work ... [w]ork history [ ] is but one of many factors to be utilized by the ALJ in determining credibility." *Marine v. Barnhart*, 2003 WL 22434094, at *4 (S.D.N.Y. 2003); *see also Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998); *Howe-Andrews v. Astrue*, 2007 WL 1839891, at *10 (E.D.N.Y. 2007) (holding that although a plaintiff with a long work history is entitled to "substantial credibility", the Commissioner may discount a plaintiff's testimony to the extent that it is inconsistent with medical evidence, the lack of medical treatment, and her own activities during the relevant period).

Having reviewed the administrative transcript in its entirety, the Court finds that the ALJ applied the correct legal standard in assessing plaintiff's credibility. The ALJ specifically addressed plaintiff's credibility and determined that "the objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations". (T. 309).  The ALJ stated:

> In addition, consideration of the factors described in 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) and SSR 96-7p also leads to a conclusion that the claimant's allegations of disabling symptoms and limitations cannot be accepted . . . (T. 311).

The ALJ found that "the claimant's activities of daily living are greater than one would expect of an individual alleging disabling pain and mental symptoms".  (T. 313).  As discussed above, plaintiff testified that he is able to engage in a plethora of physical activities including basic home repairs and exercise. (T. 500-503).  The ALJ commented on plaintiff's medication record and found it to be inconsistent with his complaints of pain. (T. 313).  The ALJ noted that plaintiff took nothing strong than Tylenol for his back and leg pain and further, that the record indicated that his depression was controlled by Remeron and BuSpar. (T. 313).  The ALJ also

discussed plaintiff's treatment records and noted plaintiff's conservative treatment for his back and limited treatment for his seizures. (T. 313).

The ALJ made note of plaintiff's "good work record" but ultimately concluded that "the claimant's employment history [does not] sufficiently offset other considerations to justify a finding of greater functional limitation than what has been determined herein". (T. 311).   In this case, taken as a whole, the record supports the ALJ's determination that plaintiff's claims were not fully credible. The Court finds that the ALJ employed the proper legal standards in assessing the credibility of plaintiff's complaints of consistent and disabling pain.  The ALJ adequately specified the reasons for discrediting plaintiff's statements.  Accordingly, the ALJ's analysis of the record and decision as to plaintiff's credibility was based on substantial evidence.

## D.     Residual Functional Capacity

Plaintiff argues that the medical evidence does not support the ALJ's assessment of his residual functional capacity ("RFC").  (Dkt No. 6, p. 17).  Specifically, plaintiff contends that if the ALJ properly considered the opinions of plaintiff's treating physicians, the ALJ would have been obligated to find that plaintiff was not capable of performing even sedentary work.  (Dkt. No. 6, p. 19).

Residual functional capacity is:

"what an individual can still do despite his or her limitations . . . .  Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."

*Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96-8p"), 1996

WL 374184, at *2 (S.S.A. July 2, 1996)).  In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis.  20 C.F.R. § 404.1545(a).

In the case at hand, the ALJ found that plaintiff has the residual functional capacity to perform a limited range of light level work.[25]  (T. 317).  Specifically, the ALJ found that plaintiff was able to:

> to lift and/or carry more than twenty pounds occasionally or ten pounds frequently; no work around unprotected heights, no climbing of ladders, ropes or scaffolds; no more than simple, repetitive tasks in a low stress environment with low production quotas and minimal interaction with the public or co-workers. (T. 317).

Plaintiff argues that based upon Dr. Hoover's assessments, he is unable to perform even sedentary work. (Dkt. No. 6, p. 18).  Specifically, plaintiff relies upon Dr. Hoover's opinion that plaintiff cannot carry ten pounds, needs to alternate between sitting and standing, and is unable to stoop.  *Id.*  The Court finds that the record lacks substantial evidence to support plaintiff's contentions.

As previously discussed, the ALJ afforded the proper weight to the opinions of  Drs. Emad, Sinha, Hoover and Kelly.  Further, as discussed, the determination that plaintiff was not fully credible is supported by substantial evidence.  Thus, plaintiff's argument that he is not capable of performing even sedentary work is without merit.

---

[25]    "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 404.1567(b).

**E.      Vocational Expert**

The ALJ concluded that plaintiff had the residual functional capacity to perform a range of light level work. (T. 36).  During the hearing, the ALJ enlisted the services of a vocational expert to determine whether there were jobs plaintiff could perform despite his limitations.  Plaintiff argues that the responses from the expert are unreliable as the "ALJ's hypothetical to the VE was fundamentally inaccurate". (Dkt. No. 6, p. 20).  Specifically, plaintiff contends that he cannot perform even sedentary work and that he suffers from panic attacks. (Dkt. No. 6, p. 19).  Defendant claims that the ALJ properly relied upon the testimony of the expert to conclude that plaintiff could perform work existing in significant numbers in the national economy. (Dkt. No. 16, p. 19).

At the fifth step of the sequential evaluation of disability, the Commissioner bears the responsibility of proving that plaintiff is capable of performing other jobs existing in significant numbers in the national economy in light of plaintiff's residual functional capacity, age, education, and past relevant work.  20 C.F.R. §§ 416.920, 416.960.  Ordinarily, the Commissioner meets his burden at this step "by resorting to the applicable medical vocational guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2 (1986)."  *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986).  Sole reliance on the grids is inappropriate where the guidelines fail to describe the full extent of a claimant's limitations.  *Id*. at 606.  For example, use of the grids as the exclusive framework for making a disability determination may be precluded where, as here, plaintiff's physical limitations are combined with non-exertional impairments which further limit the range of work he can perform.  *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).  In these circumstances, the Commissioner must "introduce the testimony of a vocational expert (or other similar

evidence) that jobs exist in the economy which claimant can obtain and perform." *Bapp*, 802 F.2d at 603.

A hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for vocational expert testimony. *Bosmond v. Apfel*, 1998 WL 851508, at *8 (S.D.N.Y.1998) (citation omitted); *see also De Leon v. Secretary of Health and Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984). If a hypothetical question does not include all of a claimant's impairments, limitations and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability. *Melligan v. Chater*, 1996 WL 1015417, at *8 (W.D.N.Y. 1996).

The "[p]roper use of vocational testimony presupposes both an accurate assessment of the claimant's physical and vocational capabilities, and a consistent use of that profile by the vocational expert in determining which jobs the claimant may still perform." *Lugo v. Chater*, 932 F. Supp. 497, 503 (S.D.N.Y. 1996). Further, there must be "substantial evidence to support the assumption upon which the vocational expert based his opinion." *Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983).

In this case, the ALJ asked the vocational expert whether there were any jobs existing in substantial numbers that a person with plaintiff's vocational and educational background, and with the following limitations could perform:

> light work, and as far as mental limitations he should be able to do simple, repetitive tasks, low stress work, low production quotas . . . minimal interaction with the public and co-workers . . . no heights . . . no ladders, ropes or scaffolds. (T. 529).

The vocational expert responded that a person with this set of assumptions could perform the job of a sorter or dispatcher. (T. 531, 533). Plaintiff argues that the ALJ's omission of "panic

attacks" from the hypothetical renders it unreliable. The Court finds that substantial evidence exists to support the ALJ's decision to exclude this limitation from the proposal.

The ALJ presented the vocational expert with plaintiff's RFC which, as previously discussed, is based upon substantial evidence. By plaintiff's own admission, he did not complain of panic attacks until September 1998. (T. 378). Dr. Emad repeatedly concluded that plaintiff's caffeine intake and cigarette smoking contributed to the attacks. (T. 378). Moreover, Dr. Sinha stated in January 2001 that:

> "It is my opinion that he does suffer from depression and under certain circumstances he also exhibits symptoms of anxiety, which will eventually present as panic attacks. Gary has had an extensive history of treatment for depression and anxiety and both conditions are currently controlled pretty well with medication and a combination of verbal psychotherapy and other consumer related activities at this facility". (T. 450).

Thus, the Court concludes that the hypothetical posed to the vocational expert is supported by the record. Accordingly, the Court concludes that the ALJ applied the appropriate legal standards and properly relied upon the testimony of the vocational expert.

## VI.    CONCLUSION

Based upon the foregoing, it is hereby

**ORDERED** that the decision denying disability benefits be **AFFIRMED**; and it is further

**ORDERED** that defendant's motion for judgment on the pleadings is **GRANTED**; and it is further

**ORDERED** that plaintiff's complaint is **DISMISSED**; and it is further

**ORDERED** that pursuant to General Order # 32, the parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been rescinded, as such, any

appeal taken from this Order will be to the Court of Appeals for the Second Circuit; and it is further

     **ORDERED** that the Clerk of Court enter judgment in this case.

     **IT IS SO ORDERED.**

Dated:     September 24, 2008
            Syracuse, New York

                         Norman A. Mordue
                         Chief United States District Court Judge